**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

PATRICIA A. BAKER,
ADMINISTRATOR OF THE ESTATE
OF KENNETH BAKER, Deceased,

      Plaintiff,

vs.

CATLIN SPECIALTY INSURANCE
COMPANY,

      Defendant.

No. C09-4070-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING PARTIES'
CROSS-MOTIONS FOR SUMMARY
JUDGMENT**

---

**TABLE OF CONTENTS**

*I.  INTRODUCTION AND BACKGROUND* . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *A.  Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   *B.  Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*II.  LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   *A.  Summary Judgment Standards* . . . . . . . . . . . . . . . . . . . . . . . . 6
   *B.  Catlin's Commercial General Liability Policy* . . . . . . . . . . . . . . . . 10
      *1.  Standards for interpreting insurance policies* . . . . . . . . . . 14
      *2.  Arguments of the parties* . . . . . . . . . . . . . . . . . . . . 17
         *a.  "Auto"* . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
         *b.  "Mobile equipment"* . . . . . . . . . . . . . . . . . . . . 21
            *i.  Solely on the premises* . . . . . . . . . . . . . . 24
            *ii.  Transportation of persons or cargo* . . . . . . . . . 26

*III.  CONCLUSION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

# I. INTRODUCTION AND BACKGROUND

In this case, the court is asked to decide whether a pickup truck used to obtain fuel for refueling equipment on a salvage yard, constitutes an "auto" or "mobile equipment" for purposes of determining liability for bodily injury or property damage under a commercial general liability insurance policy.

## A. Factual Background

The summary judgment record reveals the following undisputed facts. Mark Hoffard ("Mark") and his brother, Michael Hoffard ("Michael"), are business partners in a scrap metal company known as "Buzz's Salvage." The salvage company is located in rural Buena Vista County, Iowa. As part of their business, the Hoffard brothers buy scrap metal, retired farm machinery, old vehicles, and iron (collectively "old iron"). The old iron is cut up and sold to metal dealers in the surrounding area. As of July 11, 2008, Buzz's Salvage owned several pieces of machinery used to haul and transport old iron, including: two flatbed roll-back trucks; one pickup truck with an attached gooseneck trailer; a GM C70 dump truck; four one-ton pickup trucks; and other pickup trucks used by the Hoffard brothers for personal and business use. In addition to these vehicles, Buzz's Salvage owned and maintained a 1979 Chevrolet pickup truck (the "Chevrolet"), which the brothers had modified for use as a refueling truck. The bed of the Chevrolet had been altered to hold a two compartment auxiliary fuel tank, each compartment holding fifty-five gallons of either gasoline or diesel fuel. The modified Chevrolet was used to fuel salvage yard equipment, particularly an excavator, payloader, and a Bobcat skidloader. When fuel was needed for the salvage yard, an employee of Buzz's Salvage would drive the Chevrolet to Storm Lake, Iowa, to obtain fuel. When not in use, the Chevrolet was stored at David Dierenfeld's residence, approximately one-half mile from Buzz's Salvage

yard. The Chevrolet was licensed for travel on public roads and bore license plate number 300TBJ.

On July 11, 2008, Michael drove his personal pickup to Buzz's Salvage yard. After attempting to use the excavator and discovering that it was low on fuel, Michael drove to the Dierenfeld residence to obtain the Chevrolet. Michael returned to the salvage yard in the Chevrolet, with the intention of refilling the fuel tanks on the excavator. As he was refilling the excavator, Michel discovered that the auxiliary fuel tank on the Chevrolet was also low. Michael stopped fueling the excavator, got back into the Chevrolet, and proceeded to drive to Storm Lake to obtain fuel for the Chevrolet's auxiliary fuel tank. In Storm Lake, Michael filled both compartments in the Chevrolet's auxiliary fuel tank with fuel at "Fuel 24."

While driving away from Storm Lake, Michael was involved in a fatal traffic accident with Kenneth Baker ("Kenneth"), a rural mail carrier. As a result of the accident, Kenneth was killed. The accident occurred at the intersection of two gravel roads: 110th Avenue and 560th Street in rural Buena Vista County, Iowa.

Subsequent to Kenneth's fatal accident, Plaintiff Patricia A. Baker ("Patricia") as Administrator of the Kenneth Baker Estate, filed a claim against the Hoffard brothers and the partnership known as Buzz's Salvage for the losses and damages sustained as a result of the July 11, 2008, death of Kenneth. At the time of the accident, the Hoffard brothers and Buzz's Salvage had in effect a policy of commercial general liability insurance, policy number 1400100847 (the "Policy"), which was issued by Defendant Catlin Specialty Insurance Company ("Catlin"). The Policy provides that Catlin will pay those sums that

the insured becomes legally obligated to pay as damages because of "bodily injury"[1] or "property damage" to which the insurance applies.  Mark, individually and on behalf of Buzz's Salvage and its partners, duly notified Catlin of the claims of the Kenneth Baker Estate and demanded that Catlin defend and indemnify them for the claims of the Kenneth Baker Estate.  On August 15, 2008, Catlin informed Mark and Buzz's Salvage that it was denying coverage for the claims of the Kenneth Baker Estate in reliance on exclusions in the Policy.

## B.  *Procedural Background*

On August 8, 2009, Patricia, as Administrator of the Kenneth Baker Estate, Deceased, filed her Complaint against Catlin.  Patricia claims that Michael negligently operated the Chevrolet on a public road and, as a proximate result of his negligence, Kenneth sustained fatal personal injuries with resultant damages to his estate.  In her Complaint, Patricia contends that during the period from May 14, 2008 to May 14, 2009, Catlin had in full force and effect a policy of commercial general liability insurance, which insured the Hoffard brothers and the partnership known as Buzz's Salvage.  Patricia requests that the court determine and declare that the Policy issued by Catlin to Buzz's Salvage and its partners, provides liability coverage for the claims of the Kenneth Baker Estate up to the Policy limits of $1,000,000.00 for the negligent acts of Michael on July 11, 2008.  Patricia asserts that the Chevrolet qualifies under the "mobile equipment" exception to the Policy because it was maintained for use as a refueling vehicle on or next

---

[1] Under Policy Section V - Definitions, (3) "'Bodily injury' means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Catlin Commercial General Liability Coverage Form at 12, Defendant's App. at 54, Docket no. 19-3).

to premises owned by the partnership and was away from the premises at the time of the accident for the incidental purpose of refilling the auxiliary fuel tank to complete the refueling operation for the partnership's excavator. Furthermore, Patricia contends that but for the full auxiliary fuel tank on the Chevrolet, the fatal bodily injury to Kenneth would not likely have occurred. Catlin filed a timely answer on November 19, 2009, in which it denied these allegations.

Catlin filed a Motion for Summary Judgment on April 28, 2010. In its motion, Catlin argues that the court can determine as a matter of law that there is no coverage under the terms of the Policy for the Chevrolet. Catlin explains that the Chevrolet with the attached auxiliary fuel tanks is an "auto" as defined by the Policy and is clearly excluded from coverage under the terms of the Policy. Furthermore, Catlin claims that the Chevrolet does not fall within the exception to the "auto" exclusion, because it is not "mobile equipment" as defined under the Policy. Patricia filed a timely resistance to Catlin's motion on May 19, 2010. In her resistance, Patricia argues that Catlin is not entitled to summary judgment since there is a genuine issue of material fact as to whether the Chevrolet was maintained for use solely on or next to the premises of Buzz's Salvage and was maintained primarily for purposes other than the transportation of persons or cargo. Patricia contends that the Chevrolet is actually "mobile equipment" and therefore qualifies under an exception to the "auto" exclusion in the Policy.

On August 10, 2010, Patricia filed her own Motion for Summary Judgment. In her motion, Patricia asserts that the Policy issued by Catlin provides coverage for bodily injury arising out of equipment that is attached to, or a part of mobile equipment, and that the Chevrolet was "mobile equipment" under the definitions of the Policy. Patricia further declares that but for the auxiliary fuel tank attached to the Chevrolet, the wrongful death of Kenneth would not likely have occurred. Because of these reasons, Patricia requests

that the court grant summary judgment in her favor and order Catlin to provide coverage for her wrongful death claim.

Catlin filed a timely resistance to Patricia's motion on October 1, 2010. In its resistance, Catlin points out that Patricia's arguments in her Motion for Summary Judgment are identical to those made in her Brief in Support of its Resistance to Defendant's Motion for Summary Judgment. Catlin alleges that Patricia is also trying to create a dispute over whether the additional weight of the gasoline in the auxiliary fuel tank was a cause of the motor vehicle accident. Catlin argues that the auxiliary tank was not a cause of the wrongful death of Kenneth, and furthermore asserts that the Chevrolet is not "mobile equipment" under the terms of the Policy because it was not maintained for use solely on the premises of the insured.

Patricia is represented by Ned A. Stockdale of Fitzgibbons Law Firm, L.L.C. in Estherville, Iowa. Catlin is represented by John C. Gray of Heidman Law Firm, L.L.P. in Sioux City, Iowa.


## II. LEGAL ANALYSIS

### A. Summary Judgment Standards

Motions for summary judgment essentially "define disputed facts and issues and . . . dispose of unmeritorious claims [or defenses]." *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1982 (2007); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986) ("One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses. . . ."). Any party may move for summary judgment regarding "all or any part" of the claims asserted in a case. FED R. CIV. P. 56(a), (b) (allowing a claimant to move for summary judgment "at any time after the expiration of 20 days from the commencement of the action or after service of a motion

for summary judgment by the adverse party," and allowing a defending party to move for summary judgment "at any time"). Summary judgment is only appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no *genuine* issue of *material* fact and that the moving party is entitled to a judgment as a matter of law." *Id.* 56(c) (emphasis added); *see Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) ("Summary judgment is appropriate if viewing the record in the light most favorable to the nonmoving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.").

A fact is *material* when it "'might affect the outcome of the suit under the governing law.'" *Johnson v. Crooks*, 326 F.3d 995, 1005 (8th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). Thus, "the substantive law will identify which facts are material." *Anderson*, 477 U.S. at 248. Facts that are "critical" under the substantive law are material, while facts that are "irrelevant or unnecessary" are not. *Id.* An issue of material fact is *genuine* if it has a real basis in the record, *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), or when "'a reasonable jury could return a verdict for the nonmoving party' on the question," *Woods*, 409 F.3d at 990 (quoting *Anderson*, 477 U.S. at 248); *see Diesel Machinery, Inc. v. B.R. Lee Indus., Inc.*, 418 F.3d 820, 832 (8th Cir. 2005) (stating genuineness depends on "whether a reasonable jury could return a verdict for the non-moving party based on the evidence"). Evidence presented by the nonmoving party that only provides "some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, such as a "scintilla of evidence," *Anderson*, 477 U.S. at 252; *In re Temporomandibular Joint (TMJ) Implants Prods. Liab. Litig.*, 113 F.3d 1484,

1492 (8th Cir. 1997), or evidence that is "merely colorable" or "not significantly probative," *Anderson* at 249-50, does not make an issue of material fact genuine.

Thus, a *genuine issue of material fact* is not the "mere existence of some alleged factual dispute between the parties." *State Auto. Ins. Co. v. Lawrence*, 358 F.3d 982, 985 (8th Cir. 2004). "'Instead, "the dispute must be outcome determinative under prevailing law."'" *Mosley v. City of Northwoods*, 415 F.3d 908, 910-11 (8th Cir. 2005) (quoting *Get Away Club, Inc. v. Coleman*, 969 F.2d 664, 666 (8th Cir. 1992), in turn quoting *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989)). In other words, a genuine issue of material fact requires "sufficient evidence supporting the claimed factual dispute" so as to "require a jury or judge to resolve the parties' differing versions of the truth at trial." *Anderson*, 477 U.S. at 248-49. Essentially, a genuine issue of material fact determination, and thus the availability of summary judgment, is a determination of "whether a proper jury question [is] presented." *Id.* at 249. A proper jury question is present if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.*

Procedurally, the moving party does not have to "support its motion with affidavits or other similar materials *negating* the opponent's claim," *Celotex*, 477 U.S. at 323, but the moving party does bear "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show a lack of a genuine issue." *Hartnagel,* 953 F.2d at 395 (citing *Celotex*, 477 U.S. at 323). Thus, a movant need only demonstrate the absence of a genuine issue of material fact and that it is entitled to judgment according to law. *See Celotex*, 477 U.S. at 323 ("[T]he motion may, and should, be granted so long as whatever is before the district court demonstrates that the standard for the entry of summary judgment, as set forth in Rule 56(c), is satisfied."). Once the moving party has successfully carried its burden under Rule 56(c),

the nonmoving party has an affirmative burden to go beyond the pleadings and by depositions, affidavits, or otherwise, designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Mosley*, 415 F.3d at 910 ("The nonmoving party may not 'rest on mere allegations or denials, but must demonstrate on the record the existence of specific facts which create a genuine issue for trial.'" (quoting *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995))). Thus, the movant must show the absence of a genuine issue of material fact as it relates to the substantive law, and the nonmovant must show the alleged issue of fact is genuine and material as it relates to the substantive law. If a party fails to make a sufficient showing of an essential element of a claim or defense with respect to which that party has the burden of proof, then the opposing party is "entitled to judgment as a matter of law." *Celotex*, 477 U.S. at 322; *In re Temporomandibular Joint*, 113 F.3d at 1492.

In considering whether a genuine issue of material fact is present the court must view all the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587-88; *Mosley*, 415 F.3d at 910. Further, the court must give such party the benefit of all reasonable inferences that can be drawn from the facts. *Matsushita*, 475 U.S. at 587-88. However, "because we view the facts in the light most favorable to the non-moving party, we do not weigh the evidence or attempt to determine the credibility of the witnesses." *Kammueller v. Loomis, Fargo & Co.*, 383 F.3d 779, 784 (8th Cir. 2004). Rather than "attempt[ing] to determine the truth of the matter . . . the court's function is to determine whether a dispute about a material fact is genuine." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996).

Of course, the facts are not the sole concern of the court; after all, a genuine issue of material fact necessarily depends on the substantive law. *See Holloway*, 884 F.2d at 366 ("The presence of a genuine issue of fact is predicated on the existence of a legal

theory which can be considered viable under the nonmoving party's version of the facts. The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under prevailing law."). Thus, the relevant law concerning plaintiff's claims is pivotal. *Anderson*, 477 U.S. at 252 ("[T]he inquiry involved in a ruling on a motion for summary judgment . . . necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits."); *see Brandon v. Lotter*, 157 F.3d 537, 539 (8th Cir. 1998) ("'In ruling on a motion for summary judgment, the court must bear in mind the actual quantum and quality of proof necessary to support liability under the applicable law.'" (quoting *Hartnagel*, 953 F.2d at 396)). Even if no genuine issue of material fact is present, summary judgment is not appropriate unless the governing law supports the moving party's position. FED. R. CIV. P. 56(c) (requiring the moving party to show that it "is entitled to judgment as a matter of law"). Moreover, summary judgment is particularly appropriate "where the unresolved issues are primarily legal rather than factual." *Aucutt v. Six Flags Over Mid-America, Inc.*, 85 F.3d 1311, 1315 (8th Cir. 1996).

### B. *Catlin's Commercial General Liability Policy*

Catlin relies on exclusions in its Policy with Buzz's Salvage to deny liability coverage for the wrongful death claims of the Kenneth Baker Estate. The exclusions from liability coverage in the Policy are as follows:

> 2. **Exclusions**
>
> This insurance does not apply to:
>
> . . . .

g.   **Aircraft Auto Or Watercraft**

"Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of    any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured.  Use includes operation and "loading or unloading."

. . . .

This exclusion does not apply to:

. . . .

(5)   "Bodily injury" or "property damage" arising out of:

(a)   The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged; or

(b)   The operation of any of the machinery or equipment listed in Paragraph f.(2) or f.(3) of the definition of "mobile equipment."

h. **Mobile Equipment**

"Bodily injury" or "property damage" arising out of:

(1)    The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured. . . .

(Catlin Commercial General Liability Coverage Form at 2-4, Defendant's App. at 44-46, Docket no. 19-3).

The Policy defines key terms in "Section V-Definitions" as follows:

2.    "Auto" means:

a.    A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or

b.    Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.

. . . .

12.    "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

a.    Bulldozers, farm machinery, forklifts or other vehicles designed for use principally off public roads;

b.    Vehicles maintained for use solely on or next to premises you own or rent;

c.    Vehicles that travel on crawler treads;

d. Vehicles, whether self-propelled or not, maintained primarily to provide mobility to permanently mounted:

   (1) Power cranes, shovels, loaders, diggers or drills, or

   (2) Road construction or resurfacing equipment such as graders, scrapers or rollers;

e. Vehicles not described in a., b., c. or d. above that are not self-propelled and are maintained primarily to provide mobility to permanently attached equipment of the following types:

   (1) Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment; or

   (2) Cherry pickers and similar devices used to raise or lower workers;

f. Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo.

   However, self-propelled vehicles with the following types of permanently attached equipment are not "mobile equipment" but will be considered "autos";

   (1) Equipment designed primarily for:

      (a) Snow removal;

(b)     Road maintenance, but not construction or resurfacing; or

(c)     Street cleaning;

(2)     Cherry pickers and similar devices mounted on automobile or truck chassis and used to raise or lower workers; and

(3)     Air compressors, pumps and generators, including spraying, welding, building cleaning, geophysical exploration, lighting and well servicing equipment.

However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos."

(Catlin Commercial General Liability Coverage Form at 12-14, Defendant's App. at 54-56, Docket no. 19-3).

### 1.     Standards for interpreting insurance policies

I first must consider the appropriate standards for interpreting terms in an insurance contract, such as Catlin's Commercial General Liability Policy at issue before me.[2] These standards were summarized by the Iowa Supreme Court in *Morgan v. American Family Mut. Ins. Co.*, 534 N.W.2d 92 (Iowa 1995):

The construction and interpretation of an insurance policy is a question of law for the court to decide. *Johnson v. Farm*

---

[2] The parties agree that Iowa law is controlling and I concur with their assessment.

> Bureau Mut. Ins. Co., 533 N.W.2d 203, 206 (Iowa 1995). The policy is to be construed as a whole, giving the words used their ordinary, not technical meaning to achieve a practical and fair interpretation. *Gracey v. Heritage Mut. Ins. Co.*, 518 N.W.2d 372, 373 (Iowa 1994). When the terms of an insurance policy are ambiguous, we will construe them against the insurer. *Id.* However, the mere fact that the parties disagree on the meaning of a particular term does not establish ambiguity. *Id.* We will not give a strained or unnatural reading to the words of the policy to create ambiguity where there is none. *West Trucking Line, Inc. v. Northland Ins. Co.*, 459 N.W.2d 262, 263 (Iowa 1990).

*Morgan*, 534 N.W.2d at 99; *See also AMCO Ins. Co. v. Rossman*, 518 N.W.2d 333, 334 (Iowa 1994) (noting that terms given ordinary meaning as reasonable person would understand them, and disagreement between parties over meaning does not establish ambiguity); *Farm Bureau Mut. Ins. Co. v. Sandbulte*, 302 N.W.2d 104, 108 (Iowa 1981) (noting that disagreement between parties as to meaning does not establish ambiguity); *Pappas v. Bever*, 219 N.W.2d 720, 721 (Iowa 1974) (holding that terms must be given their plain and ordinary meanings); *Tom Riley Law Firm, P.C. v. Tang*, 521 N.W.2d 758, 759 (Iowa Ct. App.1994) (observing that disagreement of parties as to meaning does not establish ambiguity, citing *Sandbulte*, and terms must be given their ordinary meaning, citing *Pappas* ).

To the standards stated in *Morgan* must be added only a few further points on determinations of ambiguities in insurance contracts. Under Iowa contract law, "'ambiguity exists if, after the application of pertinent rules of interpretation to the policy words, a genuine uncertainty exists as to which of two or more meanings is the proper one.'" *Jensen v. Jefferson County Mut. Ins. Ass'n*, 510 N.W.2d 870, 871 (Iowa 1994) (quoting *Connie's Constr. Co., Inc. v. Fireman's Fund Ins. Co.*, 227 N.W.2d 207, 210

(Iowa 1975)); *See Motor Club of Iowa Ins. Co. v. Iowa Mut. Ins. Co.*, 508 N.W.2d 634, 636 (Iowa 1993); *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991); *Iowa Fuel & Minerals v. Board of Regents*, 471 N.W.2d 859, 863 (Iowa 1991); *West Trucking Line, Inc. v. Northland Ins. Co.*, 459 N.W.2d 262, 263 (Iowa 1990); *Nepstad Custom Homes Co. v. Krull*, 527 N.W.2d 402, 405 (Iowa Ct. App.1994) (citing *Iowa Fuel & Minerals*); *Tom Riley Law Firm, P.C.*, 521 N.W.2d at 759 (finding that ambiguity exists when a genuine uncertainty exists over two or more meanings of the terms of the contract). The test for ambiguity is an objective one: "Is the language fairly susceptible to two interpretations?" *Met-Coil Sys. Corp. v. Columbia Cas. Co.*, 524 N.W.2d 650, 658 (Iowa 1994) (citing *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987)); *See Cincinnati Ins. Co. v. Hopkins Sporting Goods*, 522 N.W.2d 837, 839 (Iowa 1994) (same standard); *Gracey*, 518 N.W.2d at 373 (posing same question); *Iowa Fuel*, 471 N.W.2d at 863 (citing *Central Bearings Co. v. Wolverine Ins. Co.*, 179 N.W.2d 443, 445 (Iowa 1970)); *North Star Mut. Ins. Co. v. Holty*, 402 N.W.2d 452, 454 (Iowa 1987) (same standard); *Sandbulte*, 302 N.W.2d at 108 (posing same question); *see also Farm & City Ins. v. Anderson*, 509 N.W.2d 487, 491 (Iowa 1993) (formulating the test for ambiguity in an insurance policy as "whether a reasonable person would read more than one meaning into the words," citing *Smithway Motor Xpress, Inc. v. Liberty Mut. Ins. Co.*, 484 N.W.2d 192, 194 (Iowa 1992)).

To add further emphasis to a point made in *Morgan*, it is a "fundamental rule" for interpreting insurance contracts that they must be construed in the light most favorable to the insured. *Cincinnati Ins.*, 522 N.W.2d at 839; *See AMCO Ins. Co.*, 518 N.W.2d at 334 ("When the meaning of terms of an insurance policy is susceptible to two interpretations, the one favoring the insured is adopted."); *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc. v. Ins. Co. of N. Am.*, 475 N.W.2d 607, 619 (Iowa 1991); *North Star Mut.*

*Ins. Co.*, 402 N.W.2d at 454; *Rich v. Dyna Tech., Inc.*, 204 N.W.2d 867, 872 (Iowa 1973) ("Where insurance contracts are ambiguous, require interpretation, or are susceptible to equally proper constructions, the court will adopt the construction most favorable to the insured."); *The Travelers v. Mays*, 434 N.W.2d 133, 134 (Iowa Ct.App.1988) (quoting *Rich*). The reason for this rule is that insurance contracts are contracts of adhesion. *Cincinnati Ins.*, 522 N.W.2d at 839; *Jensen*, 510 N.W.2d at 871; *A.Y. McDonald Indus., Inc.*, 475 N.W.2d at 619. However, this rule applies only when the terms of the policy are ambiguous or unclear. *Farm & City Ins.*, 509 N.W.2d at 490-91.

Although interpreting the meaning of an insurance policy is most often an issue of law for the court to decide, the interpretation becomes a question of fact where the interpretation depends on "extrinsic evidence or on a choice among reasonable inferences from extrinsic evidence." *Jensen*, 510 N.W.2d at 871; *See Grinnell Mut. Reinsurance Co. v. Voeltz*, 431 N.W.2d 783, 785 (Iowa 1988). Extrinsic evidence refers to evidence other than the words of the policy. *Jensen*, 510 N.W.2d at 871; *Voeltz*, 431 N.W.2d at 785. When interpreting insurance policies, the court must "'seek to ascertain from its words the intent of the insurer and insured at the time the policy was sold.'" *Jensen*, 510 N.W.2d at 871 (quoting *Voeltz*, 431 N.W.2d at 785).

In light of these standards, I will now address the arguments of the parties regarding Catlin's Commercial General Liability Policy.

### 2. *Arguments of the parties*

Catlin argues that the Chevrolet with the attached auxiliary fuel tank is not insured for either bodily injury or property damage caused by the negligence of its driver on July 11, 2008, for the following reasons: (1) the Chevrolet is an "auto" as defined by the Policy exclusions; (2) the Chevrolet is not "mobile equipment" as defined by the Policy; (3)

exception g(5) to the exclusion for "auto" is not applicable; and (4) the auxiliary fuel tank apart from the Chevrolet is not "mobile equipment." Conversely, Patricia replies that she is entitled to summary judgment because: (1) the Policy provides coverage for bodily injury arising out of the operation of equipment that is attached to, or part of "mobile equipment;" (2) the Chevrolet was "mobile equipment" under the definition of the Policy because it was maintained for use solely on the premises of the insured and maintained primarily for purposes other than transportation of persons or cargo; and (3) but for the operation of the auxiliary fuel tank that was attached to the Chevrolet, the wrongful death of Kenneth would not likely have occurred. Each of these arguments will be addressed, in turn.

> ### a.   *"Auto"*

Catlin argues that it is entitled to summary judgment because the Chevrolet is an "auto" as defined by Policy exclusions and therefore not insured for either bodily injury or property damage caused by the negligence of its driver. The Policy "auto" exclusion is as follows:

> 2.   **Exclusions**
>
> This insurance does not apply to:
>
> . . . .
>
> g.   **Aircraft Auto Or Watercraft**
>
> "Bodily injury" or "property damage" arising out of the ownership, maintenance, use or entrustment to others of any aircraft, "auto" or watercraft owned or operated by or rented or loaned to any insured. Use includes operation and "loading or unloading."

18

(Catlin Commercial General Liability Coverage Form at 2-4, Defendant's App. at 44-46, Docket no. 19-3) Under this exclusion, if the Chevrolet meets the definition of an "auto," any bodily injury done to Kenneth by the Hoffard brothers or Buzz's Salvage is not covered by the Policy. The Policy defines "auto" accordingly:

> 2. "Auto" means:
>
> a. A land motor vehicle, trailer or semitrailer designed for travel on public roads, including any attached machinery or equipment; or
>
> b. Any other land vehicle that is subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged.
>
> However "auto" does not include "mobile equipment."

(Catlin Commercial General Liability Coverage Form at 12, Defendant's App. at 54, Docket no. 19-3). Comparing the Policy's definition of "auto" to the Chevrolet, I must first determine whether the Chevrolet is considered a "motor vehicle." The term "motor vehicle" is defined in Iowa Code § 321.1(42)(a), as "a vehicle which is self-propelled and not operated upon rails." Furthermore, a "vehicle" is defined by Iowa Code § 321.1(90) as,

> "Vehicle" means every device in, upon, or by which any person or property is or may be transported or drawn upon a highway. "Vehicle" does not include:
> a. Any device moved by human power.
> b. Any device used exclusively upon stationary rails or tracks.
> c. Any integral part of a truck tractor or road tractor which is mounted on the frame of the truck tractor or road tractor immediately behind

the cab and which may be used to transport persons and property but which cannot be drawn upon the highway by the truck tractor or another motor vehicle.

d. Any steering axle, dolly, auxiliary axle, or other integral part of another vehicle which in and of itself is incapable of commercially transporting any person or property but is used primarily to support another vehicle.

*Id.* Consequently, the Chevrolet is considered a "motor vehicle" and "vehicle" under Iowa Code § 321.1, because it is a device that is self-propelled, not operated upon rails, and upon or by which any person or property — in this case the driver and the auxiliary fuel tank — is or may be transported or drawn upon a highway. Thus, the Chevrolet also qualifies as an "auto" under the Policy, because it is a "motor vehicle" designed for travel on public roads, as demonstrated by Buzz's Salvage's using it to travel to Storm Lake to obtain fuel for its equipment.

The Chevrolet is also considered an "auto" under the Policy if it is "subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged." (Catlin Commercial General Liability Coverage Form at 12, Defendant's App. at 54, Docket no. 19-3) Iowa law requires financial liability coverage for motor vehicles operating on the highways of the state. For instance, Iowa law dictates:

[A] person shall not drive a motor vehicle on the highways of this state unless financial liability coverage, as defined in section 321.1, subsection 24B, is in effect for the motor vehicle and unless the driver has in the motor vehicle the proof of financial liability coverage card issued for the motor vehicle, or if the vehicle is registered in another state, other evidence that financial liability coverage is in effect for the motor vehicle.

I.C.A. § 321.20B(1)(a).   The Chevrolet was a "motor vehicle," licensed for travel on public roads, bearing license plate number 300TBJ, and therefore subject to Iowa's compulsory financial liability coverage law.[3]   For all these reasons, the Chevrolet qualifies as an "auto" under the Policy issued by Catlin, and, therefore, apart from an exception to the "auto" exclusion in the Policy, the Chevrolet would be excluded from coverage under the terms of the Policy.

### b.      *"Mobile equipment"*

Patricia argues that the "auto" exclusion in Catlin's Policy does not preclude coverage for the wrongful death claim at issue here because the death arose out of the operation of equipment attached to the Chevrolet, which qualifies as "mobile equipment" under an exception to the "auto" exclusion in the Policy.   Catlin rebuts this argument, claiming that the Chevrolet and its auxiliary fuel tank is not "mobile equipment" as defined by the Policy.

---

[3] "Financial liability coverage" means any of the following:

> An owner's policy of liability insurance which is issued by an insurance carrier authorized to do business in Iowa to or for the benefit of the person named in the policy as insured, and insuring the person named as insured and any person using an insured motor vehicle with the express or implied permission of the named insured against loss from liability imposed by law for damages arising out of the ownership, maintenance, or use of an insured motor vehicle within the United States of America or Canada, but subject to minimum limits, exclusive of interest and costs, in the amounts specified in section 321A.21 or specified in another provision of the Code, whichever is greater.

I.C.A. § 321.1(24B).

The exception to the "auto" exclusion, relied upon by Patricia, states:

g.    **Aircraft, Auto Or Watercraft**

. . . .

This exclusion does not apply to:

. . . .

(5)    "Bodily injury" or "property damage" arising out of:

(a)    The operation of machinery or equipment that is attached to, or part of, a land vehicle that would qualify under the definition of "mobile equipment" if it were not subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. . . .

(Catlin Commercial General Liability Coverage Form at 4, Defendant's App. at 46, Docket no. 19-3)  In addition, the term "mobile equipment" is defined by the policy as,

12.    "Mobile equipment" means any of the following types of land vehicles, including any attached machinery or equipment:

. . . .

b.    Vehicles maintained for use solely on or next to premises you own or rent;

. . . .

f.    Vehicles . . . maintained primarily for purposes other than the transportation of persons or cargo.

. . . .

> However, "mobile equipment" does not include any land vehicles that are subject to a compulsory or financial responsibility law or other motor vehicle insurance law in the state where it is licensed or principally garaged. Land vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered "autos."

(Catlin Commercial General Liability Coverage Form at 14, Defendant's App. at 56, Docket no. 19-3)

It is clear that under the terms of the Policy, the Chevrolet without the auxiliary fuel tank does not qualify as "mobile equipment." The above citation from the Policy clearly states that "[l]and vehicles subject to a compulsory or financial responsibility law or other motor vehicle insurance law are considered 'autos'" and not "mobile equipment." It has already been established that the Chevrolet was an "auto," licensed for travel on public roads, and therefore subject to the compulsory financial liability coverage law in Iowa. Thus, the Chevrolet is an "auto" as defined by the Policy and the Policy does not provide coverage for bodily injury and property damage arising from its operation.

Nevertheless, Patricia argues that under the (g)(5)(a) provision in the Policy, the Policy provides coverage for bodily injury and property damage arising out of the operation of the auxiliary fuel tank that was attached to the Chevrolet. Patricia explains that but-for the additional weight added to the Chevrolet caused by the auxiliary fuel tank, the collision resulting in the death of Kenneth would not likely have occurred. Therefore, Patricia asserts, the Chevrolet with its auxiliary fuel tank qualifies under the definition of "mobile equipment" because it was maintained for use solely on the premises of the insured and maintained primarily for purposes other than transportation of persons or cargo.

Catlin disputes whether the Chevrolet with the auxiliary fuel tank meets the Policy's definition of "mobile equipment." Under the terms of the Policy (g)(5)(a), Catlin could be responsible for any "bodily injury" or "property damage" inflicted on Kenneth arising out of "[t]he operation of machinery or equipment [auxiliary fuel tank] that is attached to, or part of, a land vehicle [Chevrolet] that would qualify under the definition of 'mobile equipment,'" even though the Chevrolet is subject to compulsory financial liability coverage law in Iowa. (Catlin Commercial General Liability Coverage Form at 4, Defendant's App. at 46, Docket no. 19-3) Thus, Patricia must establish that under the definition of "mobile equipment," the Chevrolet with the auxiliary fuel tank was either: maintained for use solely on or next to the premises owned or rented by Buzz's Salvage; or maintained primarily for purposes other than the transportation of persons or cargo.

**i.    *Solely on the premises*.**

Under the Policy definition 12(b), "[m]obile equipment means any of the following types of land vehicles, including any attached machinery or equipment: (b) Vehicles maintained for use solely on or next to premises you own or rent." (Catlin Commercial General Liability Coverage Form at 13, Defendant's App. at 55, Docket no. 19-3) In light of this definition, Patricia argues that the Chevrolet with the auxiliary fuel tank is "mobile equipment" under Policy definition 12(b) because it was maintained for use and used solely on the premises of the insured and for the primary and sole purpose of refueling the excavator, payloader, and Bobcat skidloader. Patricia points out that the Chevrolet with the auxiliary fuel tank was maintained or kept in existence, solely or exclusively, for the purpose of refueling equipment on the premises of Buzz's Salvage. Patricia claims that the Chevrolet's refueling function was not only its primary function, it was its *only* function, and that use occurred only on the premises of Buzz's Salvage.

The facts in this case are undisputed: the accident occurred on a public gravel road and not on or next to Buzz's Salvage premises; and the Chevrolet was used primarily to obtain fuel from Storm Lake and transport it back to Buzz's Salvage to refuel the excavator, payloader, and Bobcat. The Eighth Circuit Court of Appeals decided an analogous decision in *Indiana Lumbermens Mut. Ins. Co. v. Timberland Pallet and Lumber Co., Inc.*, 195 F.3d 368 (8th Cir. 1999). In *Indiana Lumbermens*, the Eighth Circuit Court of Appeals held that a dump truck, used primarily to move sawdust from place to place, did not meet the definition of "mobile equipment" under the insurance policy when it collided with a motor vehicle on a public highway.[4] The court found that the plain meaning of the definition for "mobile equipment" restricted "'use' to a certain territory, that is, on or next to premises owned or rented by the insured." *Id.* at 378. The court disagreed that "a reasonable interpretation of the term 'maintained for use' refers to the insured's intended use of the vehicle, that is, that the dump truck is mobile equipment because [the insured] had intended to use it solely on or next to its premises." *Id.*

In view of this decision, I reject Patricia's assertion that a reasonable interpretation of the term "maintained for use" refers to the insured's intended use of the vehicle, that is, the Chevrolet was maintained exclusively for the purpose of refueling equipment on the premises of Buzz's Salvage. Contrary to Patricia's interpretation, I find that the Chevrolet's actual purpose was to obtain fuel from Storm Lake and transport it to Buzz's Salvage. If the Chevrolet never left the salvage yard to obtain fuel for the auxiliary tank, its purpose would be nonexistent, because one cannot refuel an excavator, payloader, and

---

[4] The Eighth Circuit Court of Appeals held that the insurance policy was not ambiguous, which described "mobile equipment" as "vehicles maintained for use solely on or next to premises you own or rent." *Indiana Lumbermens Mut. Ins. Co.*, 195 F.3d at 377. This language is identical to Catlin's.

Bobcat without first obtaining fuel. I also find that, opposed to Patricia's assertions, the term "solely" is not ambiguous. The *Merriam-Webster's Dictionary* defines the term "solely" to mean "to the exclusion of all else." (www.merriam-webster.com, last visited February 4, 2011). Thus, it is clear that under Policy definition 12(b), the Chevrolet must have been used exclusively on or next to the premises of Buzz's Salvage. Driving the Chevrolet down the highway to a neighboring city miles away to obtain fuel is not a reasonable interpretation of the definition of a "vehicle maintained for use solely on or next to premises you own or rent." As a result, I find that the Chevrolet with the auxiliary fuel tank does not constitute "mobile equipment" under Policy definition 12(b) because it was not used solely on the premises of Buzz's Salvage.

### ii.     *Transportation of persons or cargo*.

Patricia also contends that the Chevrolet with the auxiliary fuel tank is "mobile equipment" under the Policy terms because it was maintained primarily for purposes other than transportation of persons or cargo. Under Policy definition 12(f), "[m]obile equipment means any of the following types of land vehicles, including any attached machinery or equipment: (f) Vehicles not described in a., b., c. or d. above maintained primarily for purposes other than the transportation of persons or cargo." (Catlin Commercial General Liability Coverage Form at 14, Defendant's App. at 56, Docket no. 19-3) In view of this definition, Patricia asserts that a reasonable person should conclude that the primary purpose of the Chevrolet with the auxiliary fuel tank was to refuel the excavator, payloader, and Bobcat on the site of the salvage yard. Thus, the Chevrolet's primary purpose was other than the transportation of persons or cargo and it should fall within the Policy definition 12(f) of "mobile equipment." Patricia goes even further, stating that apart from its use as a refueling vehicle, there would be no reason to keep the

vehicle because Buzz's Salvage had several other vehicles used to transport old iron and persons.

In determining whether the Chevrolet qualifies as "mobile equipment" maintained primarily for purposes other than the transportation of persons or cargo under Policy definition 12(f) , I will turn once again to the relevant Eighth Circuit Court of Appeal's decision in *Indiana Lumbermens*, 195 F.3d at 378.[5] In this decision, the court held that a reasonable interpretation of "the term 'transportation' is not limited to carrying persons or cargo over long distances." *Id.* The court found that a dump truck used primarily to move sawdust from one place to another "thus was not 'maintained primarily for purposes other than the transportation of persons or cargo' within the definition of 'mobile equipment' in subdivision (f)."[6] Patricia argues that *Indiana Lumbermens Mut. Ins. Co.* is distinguishable on its facts, in that unlike the use of the dump truck in *Indiana* to carry sawdust or "cargo" offsite, the purpose of the Chevrolet was to refuel equipment on the premises of Buzz's Salvage. Patricia thus rationalizes that the Chevrolet's travel off site for the limited purpose of obtaining fuel was only incidental to its use.

I find such arguments unpersuasive. The case before the court is similar to *Indiana Lumbermens Mut. Ins. Co.*, in that, like the dump truck, the Chevrolet's actual purpose

---

[5] The court notes that the Chevrolet with the auxiliary fuel tank does not fall under sub-sections a., b., c., or d. of Policy definition 12, because the Chevrolet is not: a bulldozer, farm machinery, forklift, or other vehicle designed for use principally off public roads; a vehicle that can travel on crawler treads; a vehicle maintained primarily to provide mobility to permanently mounted power cranes, shovels, loaders, diggers, and drills, or road construction equipment such as graders, scrapers, or rollers. (Catlin Commercial General Liability Coverage Form at 13-14, Defendant's App. at 55-56, Docket no. 19-3)

[6] Subdivision (f) defined "mobile equipment" as, "Vehicles . . . maintained primarily for purposes other than the transportation of persons or cargo." *Indiana Lumbermens Mut. Ins. Co.*, 195 F.3d at 372.

was to move cargo from one place to another, specifically, to obtain fuel from Storm Lake and transport it to Buzz's Salvage. Contrary to Patricia's argument, that the sole purpose of the Chevrolet was to refuel equipment on the premises of Buzz's Salvage, one could not refuel equipment on the premises on Buzz's Salvage unless the Chevrolet was able to transport the fuel from a gas station miles away.[7] Additionally, "cargo" is defined by *Merriam-Webster's Dictionary* as "the goods or merchandise conveyed in a ship, airplane, or vehicle." (www.merriam-webster.com, last visited February 4, 2011). Notably, the sentence example provided by *Merriam-Webster's Dictionary* is "[t]he ship was carrying a cargo of crude oil." *Id.* It is clear that in this case, the Chevrolet with its auxiliary fuel tank was carrying a "cargo" of fuel, purchased by Buzz's Salvage in Storm Lake, and then "conveyed" or "transported" back to the salvage yard.[8] Thus, I find that the Chevrolet

---

[7] Contrary to Patricia's claim that there would be no reason to keep the Chevrolet apart from its use as a refueling vehicle, the Chevrolet could also be utilized to transport persons, as admitted to by Michael when he testified during his deposition that the Chevrolet was used by Dave Dierenfeld to drive to the salvage yard from his residence. (Docket No. 19-3, p. 19)

[8] Even if the auxiliary fuel tank constituted "mobile equipment" by itself, any bodily injury or property damage arising out of its transportation by the Chevrolet would also be excluded from coverage under Catlin's Policy. The Policy states:

2.    **Exclusions**

This insurance does not apply to:

. . . .

h.    **Mobile Equipment**

"Bodily injury" or "property damage" arising

(continued…)

with the auxiliary fuel tank fails to meet the definition of "mobile equipment" under Policy definition 12(f), because it was not "maintained primarily for purposes other than the transportation of persons or cargo." (Catlin Commercial General Liability Coverage Form at 14, Defendant's App. at 56, Docket no. 19-3)

---

[8](…continued)

        out of:

        (1)    The transportation of "mobile equipment" by an "auto" owned or operated by or rented or loaned to any insured . . .

(Catlin Commercial General Liability Coverage Form at 3-4, Defendant's App. at 45-46, Docket no. 19-3)

### III.  CONCLUSION

For the reasons stated above, the court concludes no genuine issues of material fact exist because the Chevrolet is not insured for either bodily injury or property damage caused by negligence of its driver under the terms of Catlin's Commercial General Liability Policy issued to the Hoffard brothers and Buzz's Salvage.  As a result, the Policy does not provide coverage for Patricia's wrongful death claim.  Thus, the Defendant's Motion for Summary Judgment is **granted** and Plaintiff's Cross-Motion for Summary Judgment is **denied**.  Judgment shall issue accordingly.

**IT IS SO ORDERED.**

**DATED** this 15th day of February, 2011.

MARK W. BENNETT
U. S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA